Filed 11/10/21  In re T.S. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re T.S. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E077125 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J265157, J265158, J265159 & J265160) |
| v. | OPINION |
| V.O., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Christopher B. Marshall, Judge.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, and David Guardado, Deputy County Counsel, for Plaintiff and Respondent.

1

V.O. (Mother) is the mother of 10-year-old T.S., 12-year-old N.S., 15-year-old R.W., and 16-year-old D.R.[1]  Mother appeals from the juvenile court's order denying her Welfare and Institutions Code[2] section 388 petition.  She contends the court abused its discretion in denying her petition without an evidentiary hearing because she had made a prima facie showing of changed circumstances and that her request was in the children's best interest.  We disagree and affirm the order.

## FACTUAL AND PROCEDURAL HISTORY

The family came to the attention of the San Bernardino County Children and Family and Services (CFS) on April 11, 2016, after a referral was received against Mother alleging physical abuse, general neglect, and caretaker absence/incapacity.  The children were residing with two maternal aunts:  D.R. and R.W. resided with maternal aunt J.O., and T.S. and N.S. resided with a different maternal aunt.  The aunts reported that Mother had a history with substance abuse and mental health, and could no longer care for the children.  Mother had not visited the children, but in the past she had picked them up and placed them in "harm's way."  The children had also been sexually abused in the past while in Mother's care.

A social worker interviewed D.R. and R.W. three days later on April 14, 2016.  D.R. and R.W. were 11 and nine years old at the time, respectively.  The children

---

[1]  Each child has a different father.  The alleged fathers are not parties to this appeal.

[2]  All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

confirmed the allegations, noting Mother had physically abused them with a closed fist, hangers, and/or a belt all over their bodies. R.W. and D.R. each separately stated that they were fearful of Mother and that they were scared Mother would take them away from their aunt. D.R. noted that he did not want to live with Mother "ever again" and that if Mother came back to get him he would run away. A medical examination of D.R. after his aunt picked him up revealed that he had bruising to his left eye, back pain, and tissue damage.

When the social worker attempted to contact T.S. and N.S. at the other maternal aunt's home, the children were not present. The aunt reported that Mother had contacted law enforcement and demanded the children be returned to her care. Mother believed the aunts were keeping the children for welfare benefits. The aunt did not know Mother's current residence but was certain it was in Adelanto.

The social worker located Mother's residence on April 22, 2016, and found Mother home with T.S. T.S., who was four years old at the time, was interviewed and confirmed the allegations, noting Mother " 'keeps on whoopin' me' " with a belt. T.S. reported that Mother hit him and his siblings all over their bodies with her hand, a clothes hanger, or a belt. T.S. added that Mother and her boyfriend R.D. engaged in domestic violence in his presence and that R.D. hits Mother in the stomach. N.S., who was seven years old, was interviewed privately at her school and corroborated the allegations. She noted that Mother and R.D. often fight at night and that she and T.S. were scared of the

3

fighting and would cry until they fell asleep. N.S. was fearful of Mother due to her physically abusing her and her siblings.

Mother initially denied physically abusing the children or domestic violence between her and her boyfriend. She, however, eventually admitted the allegations but minimized her actions. As a result of Mother's physical abuse and actions, all the children reported being fearful and anxious. R.W. suffered from an inability to sleep, T.S. from bed wetting, and D.R. with difficulties eating. Due to the children's statements and concerns for their safety, CFS obtained a detention warrant and detained them from Mother's care.

Subsequently, petitions were filed on behalf of the children pursuant to section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), and (c) (serious emotional damage). Amended petitions were later filed on behalf of the children based on the allegations related to sexual abuse of the children while in Mother's care pursuant to section 300, subdivision (d), and no provision for support by the fathers under section 300, subdivision (g). The children were formally detained from Mother's care at a detention hearing held on April 27, 2016.

CFS recommended that the allegations in the petitions be found true and that Mother be provided with reunification services. Mother continued to minimize her actions. She denied hitting the children with a closed fist or with clothes hangers. She admitted hitting the children with a belt, but only on their buttocks. She also denied abusing or neglecting the children, and stated the children were " 'liars.' " She denied

4

any concerns related to her history of abusing methamphetamine and indicated that she currently smoked marijuana and drank alcohol twice a month.

Further investigation by CFS revealed that in 2014 the children had reported that Mother's husband had digitally penetrated the children's rectums and showed them his genitals.[3] The children were seen by a forensic pediatrician, who found all of the children tested positive for chlamydia. Mother did not believe the children had been sexually abused by T.L.S. and claimed the children had accused him of "raping them" because they did not want to live with him. Mother failed to purchase the medication required to treat the children's chlamydia. At the time of the current investigation, N.S. and T.S. reiterated concerns of sexual abuse, D.R. denied the sexual abuse, and R.W. indicated that he could not remember and did not believe he had been sexually abused.

Following a contested jurisdictional/dispositional hearing on August 25, 2016, the juvenile court found true the allegations in the amended petitions and declared the children dependents of the court. Mother was provided with reunification services and ordered to participate in her case plan.

By the six-month review hearing, CFS reported that Mother's prognosis for reunification was moderate and recommended additional services for Mother. Mother had completed an outpatient substance abuse treatment program, but indicated that she did not believe she had a substance abuse problem. Mother recognized having an anger management problem and anger management was added to her case plan. At the

---

[3] It was initially reported that Mother's husband, T.L.S., was T.S.'s father. A paternity test later revealed that he was not the biological father of T.S.

5

February 27, 2017 six-month review hearing, the juvenile court ordered Mother to engage in a domestic violence program and continued Mother's services for another six months. The court set an appearance review hearing to address the issue of unsupervised visitation.

At the appearance review hearing, the juvenile court ordered unsupervised visitation between Mother and the children twice a week for two hours over CFS's minor's counsel's objections.

By the 12-month review hearing, CFS recommended that Mother's reunification services be terminated and a section 366.26 hearing be set. Although Mother's unsupervised visits were going well and she had participated in nine domestic violence classes, she did not appear to benefit from the services received. Mother had continued her relationship with her abusive boyfriend R.D. for the past two years. And since the children were detained, R.D. had been convicted of battery against Mother and was arrested for raping Mother. After the social worker informed Mother that her children would not be returned to her care if she continued to reside with R.D., Mother stated she would end her relationship with R.D. and find another residence. However, she returned to R.D.'s home and was the victim of a sexual assault perpetrated by R.D. Mother had returned to R.D.'s home despite the prior physical assault perpetrated by R.D. that resulted in R.D.'s arrest. During that prior assault, R.D. had choked Mother until she lost consciousness. He also punched Mother in the face, pushed her onto a glass table, and bent her finger in an attempt to prevent her from leaving the home. In addition, CFS

6

received an anonymous tip that Mother was engaged in gang activity and had ongoing anger issues.

The contested 12-month review hearing was held on August 16, 2017. The juvenile court found that Mother had not sufficiently addressed the issues which led to the children's removal, terminated her reunification services, and set a section 366.26 hearing. The court continued Mother's unsupervised visits twice a week for two hours.

CFS recommended that a legal guardianship be established for the children with maternal aunt J.O. with whom two of the children had been residing since their removal. Mother had not visited the children in several months.

The section 366.26 hearing was held on January 30, 2018. Mother's counsel informed the court that Mother agreed with the recommendation to establish a legal guardianship. The court ordered the guardianship established for the children with maternal aunt J.O. (guardian).

Sadly, about two years later on March 12, 2020, the children were removed from their guardian's home following allegations of physical and emotional abuse committed by the guardian and her live-in girlfriend. All the children reported being physically abused by their guardian and her partner with a belt and/or a closed fist. The children also disclosed the guardian and her partner yelled and cursed at them. The guardian and her partner denied the allegations.

After the children were removed from their legal guardian, CFS filed section 387 supplemental petitions on behalf of the children. The children were formally detained from the guardian at the detention hearing on March 20, 2020.

CFS recommended that the allegations in the section 387 petitions be found true and that the guardian be provided with reunification services. Mother sought custody of the children. CFS, however, recommended that no further reunification services be provided to Mother. The guardian continued to deny the use of any physical discipline toward the children and indicated that she would take away electronics from all of the children and make the boys do push-ups, leg lifts, and read the bible as discipline. She also stated that she believed Mother was manipulating the children to make accusations against her in order for them to return to Mother's care.

The children reiterated the prior disclosures of physical abuse and also disclosed that they had observed the guardian and her partner smoke marijuana in the home and drink alcohol regularly. Specifically, during a forensic interview with the social worker and a detective present, the children reported being hit with belts and hangers, leaving injuries. They were also forced to stay in an exercise position for two hours at a time, causing the children to be in pain. If the children did not do the exercise position correctly, they would be hit with a belt. None of the children desired to visit the guardian or to speak to her on the phone at that time. One of the children noted that they had been texting Mother with information regarding the ongoing abuse in the guardian's home. Mother acknowledged previously utilizing corporal punishment on the children and

8

engaging in domestic violence but claimed that the children were no longer fearful of her. The children desired to return to Mother.

In July 2020, CFS recommended no reunification services for the guardian and termination of the guardianship due to the severe physical abuse reported by the children. Although the children had expressed a desire to return to Mother, there was no information reported as to Mother's ability to be appropriate and protective of the children that would have been different from the time when her reunification services were terminated. CFS thus did not recommended the children return to Mother's care at that time.

CFS continued to recommend no services for the guardian in November 2020 and informed the court that D.R. was residing in a foster home in Victorville apart from his siblings. D.R. was playing with a local youth basketball team but decided to quit the team based on a belief that he would be returning to Mother's care. CFS recommended that Mother's visits revert to supervised due to her continued promises to the children that they would be returning to her custody. Mother told D.R. that she had purchased a dog for him, that he needed to come over to her home more to take care of the dog, and that they would discuss what high school he would attend upon his return home. The children reported that Mother had told them that she was going to get them back and they would return home. The social worker noted that in order for the children to return to her care, Mother would need to provide evidence demonstrating the issues that led to the children's removal had been resolved.

The contested jurisdictional/dispositional hearing on the section 387 petitions was held on November 4, 2020. The guardian was not present, but Mother was. The court found true the allegations in the section 387 petitions as amended, continued the children as dependents of the court, and terminated the guardianship.

Mother thereafter testified regarding CFS's recommendation to revert her visitation to supervised and her request for services. She stated that she had been receiving unsupervised visitation twice a week for two hours. She denied that the dog she purchased was intended for the children or that she was having any conversations with the children regarding their return to her care. Mother testified that she had engaged in parenting education, domestic violence, and anger management programs. She acknowledged engaging in domestic violence but denied that she had ever used physical discipline on the children. Mother stated that other than for domestic violence she could not recall why the children were initially removed from her custody. She claimed that she was not aware that the children had contracted a sexually transmitted infection and suffered sexual abuse. Upon questioning by CFS's counsel, Mother admitted to "whoop[ing]" the children. Mother was married for about a year and lived with her husband who had not been cleared by CFS. The court also received stipulated testimony from D.R. in which he denied any recollection of Mother talking to him about his potential return home.

As to the visitation issue, the court found that Mother's testimony was not credible, and further concluded that D.R.'s stipulated testimony was not credible as it was

10

contrary to every report by the children regarding Mother's discussions with them. The court ordered Mother's visits to be supervised and gave CFS the authority to return to unsupervised, if appropriate. The court denied Mother's request for reunification services due to concerns about Mother minimizing the issues that led to the court's initial involvement. The court found Mother had not demonstrated that she had benefitted from the services she had participated in to address the significant issues which led to the children's initial removal.

About five months later, on April 27, 2021, Mother filed a section 388 petition requesting that the court "order reunification" so that the children could be returned to her care. As new information, she stated that she had taken more classes, including parenting, domestic violence, anger management, and self-esteem classes, and provided certificates of competition from several parenting/anger management and domestic violence programs. Regarding why the request would be in the children's best interest, Mother stated she was "a totally different person," could "definitely protect [the children]," and "keep them safe."

The court ordered CFS to investigate Mother's request and set a hearing to determine whether to grant an evidentiary hearing on the section 388 petition. CFS recommended that Mother's section 388 petition be denied. Mother was interviewed and indicated that the children were removed from her care as a result of sexual abuse by her husband, domestic violence, and her use of marijuana. She claimed that she was not aware the children had contracted chlamydia from the sexual abuse until she read it in the

11

court reports when the children were removed from the guardian. Although Mother indicated that she believed the children's reports of the sexual abuse allegations, she questioned whether her husband had sexually abused the children since he did not have chlamydia and "was set free." CFS opined that Mother had still not addressed the concerns that led to the children's initial removal from her care as Mother still failed to take responsibility for her knowledge of ongoing abuse to the children. The social worker believed that although there is mutual love between Mother and the children, "the likelihood of the children being abused, should they reunify with [Mother] [was] high." The social worker, therefore, concluded reunification services to Mother was not in the children's best interest.

A hearing as to Mother's section 388 petition was held on May 26, 2021. The court found that Mother had only shown changing circumstances, not changed circumstances, and that the requested relief did not promote the best interest of the children. The court thereafter denied the section 388 petition without an evidentiary hearing. Mother timely appealed.

## DISCUSSION

Mother contends that the juvenile court abused its discretion by denying her section 388 petition without an evidentiary hearing because she had demonstrated her circumstances had changed and that it was in the children's best interest to be provided with services. She claims that she had made the requisite prima facie showing necessitating an evidentiary hearing. We are not persuaded.

12

We review the juvenile court's denial of Mother's section 388 petition without an evidentiary hearing for abuse of discretion.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317-318 (*Stephanie M.*); *In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1079.)  The denial must be upheld unless we can determine from the record that the juvenile court's decision exceeded the bounds of reason by making an arbitrary, capricious, or patently absurd determination.  (*In re A.S.* (2009) 180 Cal.App.4th 351, 358; *Stephanie M.*, at p. 318.)  When two or more inferences can reasonably be deduced from the facts, we have no authority to substitute our decision for that of the juvenile court.  (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1505.)

Section 388 allows the parent of a dependent child to petition the juvenile court for a hearing to modify an earlier order.  (§ 388, subd. (a)(1).)  A petition to modify a juvenile court order under section 388 must allege facts showing new evidence or changed circumstances exist and that changing the order will serve the child's best interest.  (§ 388, subd. (a)(1)-(2); *In re Nolan W.* (2009) 45 Cal.4th 1217, 1235.)  Courts must liberally construe a section 388 petition in favor of its sufficiency.  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309 (*Marilyn H.*).)  However, section 388 requires a petitioner to make a prima facie showing of both elements to trigger an evidentiary hearing.  (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.)  If, for instance, the parent makes a prima facie showing of changed circumstances, the juvenile court can still deny the petition without an evidentiary hearing if the parent fails to make a prima facie showing that the

13

relief sought would promote the child's best interest.  (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188-190.)

" 'A "prima facie" showing refers to those facts which will sustain a favorable decision if the evidence submitted in support of the allegations by the petitioner is credited.' " (*In re Josiah S.* (2002) 102 Cal.App.4th 403, 418.)  Consequently, section 388 petitions with general, conclusory allegations do not suffice.  Otherwise, the decision to grant a hearing on a section 388 petition would be nothing more than a pointless formality.  (*In re Edward H.* (1996) 43 Cal.App.4th 584, 593.)  In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case.  (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 258.)

After reunification services are terminated, the focus in dependency proceedings shifts from family reunification to the child's need for permanency and stability.  (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317; *In re G.B.* (2014) 227 Cal.App.4th 1147, 1163.)  A court entertaining a section 388 petition at this stage in the proceedings "must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child."  (*Stephanie M.*, at p. 317.)

We conclude that the juvenile court did not abuse its discretion in denying Mother's section 388 petition without an evidentiary hearing.  In her section 388 petition, Mother alleged that she had new evidence and her circumstances had changed because she had completed additional services, including parenting, domestic violence, anger

14

management, and self-esteem classes. However, this is not new evidence and does not show changed circumstances, but that her circumstances were changing as to the domestic violence issue. Moreover, while she had addressed her domestic violence issues, the record clearly shows that Mother still had not acknowledged her role in failing to protect the children from sexual abuse by her husband and her role in physically abusing them. The children were removed from Mother's care not only due to domestic violence between her and her boyfriend, but also because *she* had physically abused them and was aware of the sexual abuse to the children, resulting in them contracting chlamydia. Indeed, the family came to the attention of CFS primarily due to her physically abusing the children. Despite this fact, she failed to acknowledge her role in physically abusing the children.

"Not every change in circumstance can justify modification of a prior order." (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.) "The change[d] . . . circumstances must relate to the purpose of the order and be such that the modification of the prior order is appropriate." (*In re S.R.* (2009) 173 Cal.App.4th 864, 870.) Further, "[t]he change in circumstances or new evidence must be of such significant nature that it requires a setting aside or modification of the challenged order." (*In re A.A.*, at p. 612.)

Mother's issue was not participation and engagement in services, but her inability to benefit from the services provided to her, especially concerning the physical abuse and sexual abuse allegations, as evidenced by her statements and actions during the dependency proceedings. She had not shown in her section 388 petition to have

15

benefitted from the services provided to her. Although she provided a statement that she was a "totally different person" and could protect the children, she did not declare any steps taken to demonstrate that she understood the safety risk to the children and was capable of being protective of her children.

Furthermore, Mother did not establish that reinstating reunification services would be in the children's best interest. "In any custody determination, a primary consideration in determining the child's best interests is the goal of assuring stability and continuity." (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) By the time of a section 366.26 hearing to select and implement a child's permanent plan, the interests of the parent and the child have diverged. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 254.) Therefore, "[a]fter the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point, 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child. [Citation.] A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*Stephanie M.*, at p. 317; accord, *Marilyn H.*, *supra*, 5 Cal.4th at p. 309.)

Although the children were placed in different placements, at the time Mother filed her section 388 petition, the children's interest in stability was the juvenile court's foremost concern, outweighing any interest in reunification. The prospect of allowing

16

Mother additional reunification services to see if Mother would and could do what she was required to do to regain custody would not have promoted stability for the children, and thus would not have promoted the children's best interest. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464.)

In arguing that the requested change in this case is in the children's best interest, Mother focuses on the three factors set out in *In re Kimberly F.* (1997) 56 Cal.App.4th 519 (*Kimberly F.*). The *Kimberly F.* court, after rejecting the juvenile court's comparison of the biological parent's household with that of the adoptive parents as the test for determining the child's best interest, identified three nonexclusive factors that juvenile courts should consider in assessing the issue of the child's best interest: (1) the seriousness of the problem that led to dependency and the reason the problem had not been resolved by the time of the final review; (2) the strength of the relative bonds between the child to both the child's parent and the child's caretakers and the length of time the child has been in the dependency system in relation to the parental bond; and (3) the degree to which the problem that led to the dependency may be easily removed or ameliorated, and the degree to which it actually has been. (*Id.* at pp. 530-532.)

However, *Kimberly F.* has been criticized for its focus on the interests of the parent. The *Kimberly F.* factors conflict with our Supreme Court's holding in *Stephanie M.* that stability and continuity are the primary considerations in determining a child's best interest in the context of placement. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) Furthermore, *Kimberly F.* also fails to take into account the Supreme Court's analysis in

*Stephanie M.* of the child's best interest once reunification efforts have failed. Moreover, the same appellate court that decided *Kimberly F.* declined to apply the *Kimberly F.* factors "if for no other reason than they do not take into account the Supreme Court's analysis in *Stephanie M.*, applicable after reunification efforts have been terminated." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527 (*J.C.*).) The *J.C.* court explained, "[t]o understand the element of best interests in the context of a 388 petition filed, as in this case, on the eve of the .26 hearing, we turn to the Supreme Court's language in *Stephanie M.*, *supra*, 7 Cal.4th 295 . . . ." (*J.C.*, at p. 526.) The court instead followed the direction of our Supreme Court, "holding that after reunification services have terminated, a parent's petition for either an order returning custody or reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability." (*Id.* at p. 527.)

Moreover, even if we address the *Kimberly F.* factors, Mother had not addressed *all* the problems that led to the dependency. While she had addressed the domestic violence issue, Mother still was unwilling to acknowledge her role in physically abusing the children and her role in failing to protect the children from sexual abuse. In fact, Mother had not addressed the most serious reasons for the children's removal from her care. In addition, the record overwhelmingly indicates that Mother had violated the juvenile court's orders by discussing the case with the children and making them believe that they would be returning back to her care. It was also clear that Mother had

18

influenced D.R.'s testimony for her own protection in regard to whether she had discussed the case with the children.

On this record, Mother did not establish that the children's need for permanency and stability would be advanced by reunification efforts. It is important to keep in mind that, where, as here, the juvenile court's ruling is against the party who has the burden of proof, it is extremely difficult for Mother to prevail on appeal by arguing the evidence compels a ruling in her favor. Unless the juvenile court makes specific findings of fact in favor of the moving party, we presume the juvenile court found Mother's evidence lacked sufficient weight and credibility to carry the burden of proof. (See *Rodney F. v. Karen M.* (1998) 61 Cal.App.4th 233, 241.) It is not in the children's best interest for permanence to be delayed for an unknown or indefinite period of time, with no certainty or even likelihood Mother could progress to the point of obtaining custody of the children.

Mother is correct that section 388 serves as an " 'escape mechanism' when parents complete a reformation in the short, final period after the termination of reunification services but before the actual termination of parental rights." (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 528.) "[It] provides a means for the court to address a legitimate change of circumstances" to afford the parent one last opportunity to reinstate reunification services prior to final resolution of custody status. (*Marilyn H.*, *supra*, 5 Cal.4th at p. 309.) Mother here has not shown a legitimate change of circumstances and that granting the petition was in the children's best interest.

In sum, while Mother is to be commended for her efforts to become an effective parent by voluntarily taking classes, the fact remains that Mother has not addressed the most serious aspects that led to the children's removal from her care or established that the children can be safely maintained in her home. Accordingly, the juvenile court did not abuse its discretion in denying Mother's section 388 petition without an evidentiary hearing.

## DISPOSITION

The juvenile court's order denying the section 388 petition is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
Acting P. J.

We concur:

CODRINGTON
J.

RAPHAEL
J.